Matter of Jeter v Poole (2024 NY Slip Op 05868)

Matter of Jeter v Poole

2024 NY Slip Op 05868

Decided on November 25, 2024

Court of Appeals

Troutman, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on November 25, 2024

No. 82

[*1]In the Matter of Shani Jeter, Appellant,
v
Sheila Poole, & c. et al., Respondents.

Carolyn A. Kubitschek, for appellant.
Elizabeth A. Brody, for respondent Sheila Poole.
Amy McCamphill, for respondent David Hansell.
New York State Bar Association, Center for Family Representation, amici curiae.

TROUTMAN, J.

Petitioner contends that her indicated report on the State Central Register of Child Abuse and Maltreatment should be expunged. We disagree and affirm the order of the Appellate Division.
In June of 2019, petitioner's daughter, T.,[FN1] who was then 13 years old, disclosed to a friend that petitioner had struck her with an extension cord the previous day. T. then made the same disclosure to a teacher, a police officer, and a caseworker from the New York City Administration for Children's Services (ACS). The ACS caseworker took photographs of the cuts and bruises on T.'s arms and torso. T. was later taken to an emergency room, and the treating physician opined that her injuries were consistent with being struck with an extension cord.
ACS commenced a Family Court article 10 neglect proceeding [FN2] against petitioner and her husband, who had custody of T. and her younger sisters. Family Court authorized an adjournment in contemplation of dismissal (ACD), which allows the court to adjourn the proceedings for a period not exceeding one year "with a view to ultimate dismissal of the petition in furtherance of justice" (Family Court Act § 1039 [b]). In February of 2020, Family Court dismissed the article 10 proceeding upon the expiration of the adjournment period based on petitioner's satisfactory compliance with Family Court's conditions, including completion of parenting and anger management classes.
Meanwhile, the police officer who interviewed T. made a report to the Statewide Central Register of Child Abuse and Maltreatment (SCR). One of the SCR's primary purposes is to inform child care providers and agencies that a person has a substantiated report of child abuse or maltreatment "for the purpose of regulating their future employment or licensure" (Matter of Lee TT. v Dowling, 87 NY2d 699, 702 [1996]). In July of 2019, ACS determined that the report against petitioner was indicated (see Social Services Law §§ 422 [5]; 424 [7]), and petitioner challenged that determination (see id. § 422 [8] [a] [i]). After an internal administrative review, the New York State Office of Children and Family Services (OCFS) concluded that a fair preponderance of the evidence supported a determination that petitioner had maltreated T. and that the maltreatment was relevant and reasonably related to employment, licensure, or certification in the child care field (see id. § 422 [8] [a] [ii], [v])[FN3]. OCFS then scheduled a fair hearing for petitioner (see id. § 422 [8] [a] [iv]-[v]; [b] [i]; see also Lee TT., 87 NY2d at 704).
Petitioner's fair hearing was held in August of 2020, at which ACS had the burden of proof (Social Services Law § 422 [8] [b] [ii], [c] [ii]). Petitioner represented herself. At the time of petitioner's fair hearing, the Social Services Law provided that "the fact that there is a family court finding of abuse or neglect against the subject in regard to an allegation contained in the report shall create an irrebuttable presumption that said allegation is substantiated" (former Social Services Law § 422 [8] [b] [ii] [2019]). Before 2020, no contrary presumption applied if the Family Court article 10 proceedings were dismissed or resolved on the merits in favor of the respondent.
In April of 2020, however, the legislature enacted substantial changes to the statutes governing the SCR. One such change provided that OCFS's administrative review in SCR proceedings should be stayed until any pending Family Court article 10 proceedings regarding the same allegations are resolved (see Social Services Law § 422 [8] [a] [ii]). Another change, particularly relevant here, provided a statutory presumption regarding the dismissal of Family Court article 10 proceedings, such that the relevant statutory language now provides with respect to SCR fair hearings:
"In such a hearing, where a family court proceeding pursuant to article ten of the family court act has occurred and where the petition for such proceeding alleges that a respondent in that proceeding committed abuse or neglect against the subject child in regard to an allegation contained in a report indicated pursuant to this section: (A) where the court finds that such respondent did commit abuse or neglect there shall be an irrebuttable presumption in a fair hearing held pursuant to this subdivision that said allegation is substantiated by a fair preponderance of the evidence as to that respondent on that allegation; and (B) where such child protective service withdraws such petition with prejudice, where the family court dismisses such petition, or where the family court finds on the merits in favor of the respondent, there shall be an irrebuttable presumption in a fair hearing held pursuant to this subdivision that said allegation as to [*2]that respondent has not been proven by a fair preponderance of the evidence" (Social Services Law § 422 [8] [b] [ii]).
The legislature enacted these statutory changes on April 3, 2020, but provided that the relevant provisions, including the new "irrebuttable presumption" applicable when a Family Court article 10 petition is dismissed, "shall take effect January 1, 2022" (L 2020, ch 56, part R, § 11). Thus, at the time of petitioner's fair hearing in August of 2020, these statutory changes were enacted but not yet effective.
After the hearing, OCFS issued a decision dated September 22, 2020, in which it concluded that ACS proved the allegations by a fair preponderance of the evidence and that petitioner's actions were relevant and reasonably related to child care employment. OCFS concluded that there was "no other credible explanation" for T.'s injuries, and that petitioner's "denial and blaming the incident on the subject child was not credible." The decision further stated that "[a] review of the photos and location of the marks seem difficult for the child to inflict upon herself and there is no evidence to suggest that anyone else would have reason to hit the child with an extension cord."[FN4]
Petitioner thereafter commenced this CPLR article 78 proceeding against ACS and OCFS, seeking to challenge OCFS's determination (see Lee TT., 87 NY2d at 705 ["(I)f the report is not expunged after the hearing, the subject of the report may commence a proceeding pursuant to CPLR article 78 to challenge the decision"]). Supreme Court transferred the proceeding to the Appellate Division (see CPLR 7804 [g]). In an amended petition filed October 28, 2021, petitioner, by then represented by counsel, contended that she had a constitutional right to assigned counsel during the SCR hearing. Petitioner also contended before the Appellate Division that the "irrebuttable presumption" for Family Court article 10 dismissals should be applied to her on appeal.
The Appellate Division unanimously confirmed OCFS's determination, denied the petition, and dismissed the CPLR article 78 proceeding (206 AD3d 556 [1st Dept 2022]). The Court held that petitioner had no constitutional right to assigned counsel and that the changes to Social Services Law § 422 did not apply retroactively to SCR fair hearings held before the January 1, 2022 effective date (see id. at 557-558). The Appellate Division further concluded that OCFS's determination was supported by substantial evidence and that the hearing officer did not abuse her discretion in refusing to consider a letter purportedly authored by T. (see id. at 557). This Court granted petitioner leave to appeal (39 NY3d 911 [2023]). We now affirm.
II.
The Appellate Division properly concluded that petitioner had no constitutional right to assigned counsel during her SCR administrative hearing (see also Matter of Mangus v Niagara County Dept. of Social Servs., 68 AD3d 1774, 1775 [4th Dept 2009], lv denied 15 NY3d 705 [2010]; Matter of Gell v Carrion, 81 AD3d 953, 954 [2d Dept 2011]). Although petitioner has a protected interest in her reputation and ability to secure employment in her chosen field (Lee TT., 87 NY2d at 708-710), those interests alone are not enough to give rise to a constitutional right to the assistance of counsel. Inclusion on the SCR—unlike Family Court article 10 proceedings—does not impact rights that we have concluded warrant recognition of a constitutional right to assigned counsel in civil proceedings, such as physical liberty, bodily autonomy, or care and custody of one's children (cf. Matter of Ella B., 30 NY2d 352, 356-357 [1972]; People ex rel. Menechino v Warden, Green Haven State Prison, 27 NY2d 376, 383-385 [1971]). Property interests typically do not give rise to a constitutional right to assigned counsel (see Matter of Brown v Lavine, 37 NY2d 317, 320-322 [1975]), including the kind of property interests at stake in administrative hearings to address professional licenses or certifications (see e.g. Matter of Watson v Fiala, 101 AD3d 1649, 1650-1651 [4th Dept 2012]). "Due process considerations in such cases require only that a party to an administrative hearing be afforded the opportunity to be represented by counsel" (Matter of Baywood Elec. Corp. v New York State Dept. of Labor, 232 AD2d 553, 554 [2d Dept 1996]). Petitioner was provided with that opportunity here. Moreover, the existing [*3]statutory procedures are sufficient to ensure petitioner's due process rights are protected, such that "[w]e cannot say that fairness can only be achieved for the indigent with the aid of assigned counsel, however desirable that assistance might be" (Brown, 37 NY2d at 321).
Petitioner likens inclusion on the SCR to inclusion on the state's sex offender registry. But the right to counsel at sex offender registration (SORA) hearings is statutory, not constitutional (see Correction Law § 168-n [3]). Appellate Division cases recognizing a right to effective assistance of counsel at SORA hearings have done so on the basis that "the statutory right to counsel in such proceedings . . . would otherwise be rendered meaningless" (People v VonRapacki, 204 AD3d 41, 43 [3d Dept 2022], citing People v Bowles, 89 AD3d 171, 177-178 [2d Dept 2011]). If counsel is to be provided during SCR proceedings, "it is for the Legislature to say so, for constitutional due process does not command it" (Brown, 37 NY2d at 321).[FN5]
III.
The Appellate Division also properly concluded that the statutory amendments to Social Services Law § 422 (8) (b) (ii) do not apply retroactively to OCFS determinations rendered before the effective date the legislature provided for the amendments, i.e., January 1, 2022.
" 'It is fundamental that a court, in interpreting a statute, should attempt to effectuate the intent of the Legislature' " (Majewski v Broadalbin-Perth Cent. School Dist., 91 NY2d 577, 583 [1998], quoting Patrolmen's Benevolent Assn. v City of New York, 41 NY2d 205, 208 [1976]). "It is a fundamental canon of statutory construction that retroactive operation is not favored by courts and statutes will not be given such construction unless the language expressly or by necessary implication requires it" (id. at 584). Here, petitioner's fair hearing was held in August of 2020, and OCFS rendered its determination on September 22, 2020. When the legislature enacted the amendments to Social Services Law § 422 in 2020, it specifically provided that those amendments—including the addition of the irrebuttable presumption at issue here—would not take effect until January 1, 2022 (L 2020, ch 56, part R, § 11). Thus, it is clear that the legislature intended that the statutory amendments would not apply until January 1, 2022—well after petitioner's SCR hearing was held and OCFS's determination was rendered.
Petitioner and the dissent assert that because the statutory amendments became effective while her appeal was pending, the Appellate Division and this Court should apply it as existing law. Cases which state that the Court should simply apply the law as it exists at the time of appeal without considering the legislature's intent are cases that predate this Court's more recent precedent acknowledging that the intent of the legislature is controlling (see dissenting op at 8-10, citing, inter alia, Post v 120 E. End Ave. Corp., 62 NY2d 19, 28-29 [1984], and Matter of Asman v Ambach, 64 NY2d 989 [1985])[FN6]. In more recent cases, we have not reflexively applied statutory amendments simply because they were effective by the time the appeal was heard, but instead have analyzed what effect, if any, the legislature intended the statutory amendments to have on proceedings already commenced (see e.g. People v King, — NY3d 
—, 2024 NY Slip Op 03322, *1-2 [June 18, 2024]; People v Pastrana, 41 NY3d 23, 29-30 [2023]; Gottwald v Sebert, 40 NY3d 240, 256-260 [2023]; People v Galindo, 38 NY3d 199, 207-208 [2022]). We have observed that even where the legislature instructs that statutory amendments should apply immediately, that instruction is "equivocal in an analysis of retroactivity," because "the date that legislation is to take effect is a separate question from whether the statute should apply to claims and rights then in existence" (Majewski, 91 NY2d [*4]at 583 [internal quotation marks omitted]), and that this legislative instruction is not enough to require the application of the statutory amendments to pending litigation (see Gottwald, 40 NY3d at 259).
In Galindo, for example, the legislature enacted statutory amendments while the defendant's direct appeal was pending (see Galindo, 38 NY3d at 202). We did not apply those statutory amendments on appeal simply because they were by then effective. Instead, we concluded that the legislature intended those statutory amendments to "apply to criminal actions commenced on or after the effective date of the amendment" (id.). We reasoned that neither the statutory text nor the legislative history supported retroactive application of the statute, noting that the legislature delayed the effective date of the amendment for eight months from its enactment (see id. at 207). We stated that "[t]his lengthy lapse in time weighs against immediate application of the amendment and suggests a policy choice to effect a future change in the law," evincing the legislature's intent not to impact pending matters or to apply the amendment retroactively (id.).
The same logic applies here. The legislature enacted the relevant statutory changes in 2020 but delayed their effective date for over 18 months. The legislature certainly could have instructed that these amendments should apply to pending SCR proceedings, but it did not (cf. Gottwald, 40 NY3d at 259-260 [legislature provided that statutory amendments would apply to pending cases insofar as they have been continued after the effective date]; Asman, 64 NY2d at 990 [legislature provided that statutory amendments would apply to proceedings in which a notice of hearing had been served prior to the effective date]). Nothing contained within the statutory text or legislative history evinces a legislative intent to apply the amendments to OCFS determinations rendered before the effective date.
Petitioner's assertions that the statutory amendments should be applied retroactively to her OCFS determination because they are "procedural" or "remedial" are also unpersuasive. We have instructed that such classifications do not "automatically overcome the strong presumption of prospectivity" and that general principles regarding statutory classifications "may serve as guides in the search for the intention of the Legislature in a particular case but only where better guides are not available" (Majewski, 91 NY2d at 584 [internal quotation marks omitted]). Here, the legislature specifically instructed that the statutory amendments to Social Services Law § 422 (8) would not take effect until January 1, 2022, after petitioner's SCR proceedings had concluded.
Finally, petitioner's assertion, accepted by the dissent, that the application of the statutory amendments to cases pending on direct appeal from OCFS determinations rendered before the effective date of the amendments would have no retroactive impact is without merit. As the cases discussed above demonstrate, the application of a statutory amendment to cases pending on direct appeal may result in retroactive effect (see e.g. King, 2024 NY Slip Op 03322, *1-2; Galindo, 38 NY3d at 207; see also Matter of Regina Metro Co., LLC v New York State Div. of Housing & Community Renewal, 35 NY3d 332, 363-367 [2020]). The existence of these cases is part of the "decisional law background" of which the dissent insists the legislature must be presumed aware (see dissenting op at 13). "A statute has retroactive effect . . . if it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed" (American Economy Ins. Co. v State, 30 NY3d 136, 147 [2017] [internal quotation marks omitted]).
Application of the new irrebuttable presumption to OCFS's SCR determinations rendered before the effective date would have such retroactive effect by imposing new duties with respect to Family Court proceedings and OCFS determinations already completed. ACS asserts that it might not have offered, and Family Court might not have granted, an adjournment in contemplation of dismissal (ACD) to petitioner if the impact of that ACD would be that petitioner's indicated report would not appear on the SCR. ACS notes that this is particularly true where, as here, the allegations did not involve poverty-related neglect, which was a primary concern of the legislature (see Senate Introducer's Mem in Support of 2019 Senate Bill 6427A, Veto Jacket, Veto 232 of 2019, at 9 ["The vast majority of allegations made to the SCR involve poverty-related neglect and not child abuse"]), but rather a physical attack on the subject child.
It is undisputed that the state has "a strong interest" in protecting children from abuse (Lee TT., 87 NY2d at 710). ACS and OCFS were entitled to rely on the law as it existed at the time in order to make their determinations, in the absence of any indication of legislative intent to the contrary [FN7]. In so holding, we do not attempt to "find a [*5]'manifest injustice' " to "justify [our] determination" (dissenting op at 18), but instead attempt to effectuate the intent of the legislature.
IV. 
The Appellate Division correctly held that OCFS's determination is supported by substantial evidence in the record. Substantial evidence is a "minimal standard" that is "less than a preponderance of the evidence" and requires only that "a given inference is reasonable and plausible" (Matter of Haug v State Univ. of N.Y. at Potsdam, 32 NY3d 1044, 1045-1046 [2018] [internal quotation marks omitted]). "Where substantial evidence exists, the reviewing court may not substitute its judgment for that of the agency, even if the court would have decided the matter differently" (id. at 1046). "Where substantial evidence exists to support a decision being reviewed by the courts, the determination must be sustained, irrespective of whether a similar quantum of evidence is available to support other varying conclusions" (id. [internal quotation marks omitted]; see also Matter of Black v New York State Tax Appeals Trib., 41 NY3d 131, 145 [2023]).
The Appellate Division correctly concluded that OCFS's determination was supported by substantial evidence. T. consistently recounted her version of events to a teacher, police officer, and ACS. A treating physician opined that T.'s visible and documented injuries were consistent with being struck by an extension cord. Although petitioner asserted that T.'s allegations were false, petitioner never offered an alternative explanation for T.'s injuries. OCFS determined that there was no other credible explanation for T.'s injuries and that petitioner's "denial and blaming the incident on the subject child was not credible." For the same reasons, the hearing officer did not abuse her discretion in refusing to consider an undated note, purportedly written by T., asserting that petitioner did not abuse her but providing no alternative explanation for her documented injuries (see Matter of Charlotte MM. v Commissioner of Children & Family Servs., 159 AD3d 1081, 1082-1083 [3d Dept 2018]; Matter of R.B. v New York State Off. of Children & Family Servs., 199 AD3d 429, 430-431 [1st Dept 2021]).
Although the dissent would not address the substantial evidence issue (see dissenting op at 18), the dissent adopts petitioner's view of the facts (dissenting op at 3-4)[FN8]. This is antithetical to our substantial evidence standard of [*6]review. On this record, Family Court did not "determine" anything regarding the ultimate merits of T.'s allegations (see dissenting op at 18), i.e., that T.'s allegations were false or her subsequent alleged recantation was credible. Rather, Family Court dismissed the article 10 proceedings against petitioner after the expiration of the adjournment period in accordance with the adjournment in contemplation of dismissal.
An ACD is not a determination that allegations of abuse or neglect were fabricated, unfounded, or unsubstantiated. It is not a determination on the merits of the allegations at all, but rather "leaves the question unanswered" (Matter of Marie B., 62 NY2d 352, 359 [1984]). An ACD constitutes a determination by the parties and Family Court that the ends of justice and the needs of the child would be best served by allowing the Family Court respondent to comply with certain conditions, and, so long as those conditions are met, the proceeding will be dismissed (see e.g. Matter of R.B., 199 AD3d at 430, citing Matter of Stephen FF. v Johnson, 23 AD3d 977, 978 [3d Dept 2005]).
Accordingly, the order of the Appellate Division should be affirmed, without costs.

WILSON, Chief Judge (dissenting):

Family Court dismissed charges of child abuse levelled at Shani Jeter and her husband by their teenage daughter. The legislature determined that in such situations, the Office of Children and Family Services (OCFS) could not continue to list their names on New York's Statewide Central Register, which identifies persons charged with abuse or neglect of children. Both Ms. Jeter and her husband brought administrative proceedings to change their designations in the Register from "Indicated" to "Unfounded," at which only Ms. Jeter's husband was represented by counsel. OCFS granted Ms. Jeter's husband's request but not hers, leaving her listed as "Indicated" for having abused or neglected a child. The majority concludes that this result is warranted because the legislature did not intend the new law to apply retroactively. But this case has nothing to do with retroactivity; instead, it rests on a long-settled doctrine that courts [*7]apply changes in law that take effect when a case is pending. Because Ms. Jeter's case was pending before the Appellate Division when the new legislation took effect, it is governed by that legislation. 
Here, applying the new legislation to pending cases furthers the legislature's stated goal to address disparities in outcomes for poor people and across racial lines. The legislature determined that the best way to do this was by ensuring that the Family Court determination was binding on whether the report was "indicated" or "unfounded" in the Register. Despite the majority's contention that "it is clear that the legislature intended" that these amendments would not apply to someone in Ms. Jeter's position (majority op at 9), the legislature did nothing to displace the longstanding, universal rule that changes in law apply to cases pending on appeal. Instead, the majority undermines the law's purpose by misconstruing the relevant doctrine, pointing to the legislature's silence, and inventing reasons to call this law retroactive.

 
 I.
 After school one day in June 2019, 13-year-old T. disappeared. Her mother, Shani Jeter, filed a missing person's report with the police [FN9]. T. had been diagnosed with oppositional defiant disorder and saw a therapist. T. turned up later that day at a different school with a person she refused to identify and went to the police, displaying marks on her arms and upper body. She told the police that her mother had beaten her with an electrical cord the day before. T. also accused her father of beating her in the past and said that the parents often beat her and her two younger sisters with extension cords and belts.

Inconsistently with her account of abuse, T. had left for school with no marks on her arms and her teachers confirmed that she had no marks on her arms when she was at school that day. T. told the Administration for Children's Services (ACS), the New York City children's protective services agency, that Ms. Jeter beat her because two days earlier T. had defaced a computer monitor by etching a smiley face and a curse word onto it; she had actually defaced the monitor a month earlier. Within two weeks, T. recanted her entire story, a piece at a time. T. first retracted her statements that her younger sisters had been beaten, and the older of the two (10 years old) told ACS that her parents had never hit any of the sisters. T. next retracted her own statement; she said she had never been beaten with any object, saying that she had only been hit on one prior occasion. Finally, she signed a document saying she had made up the accusations, which her lawyer (not her parents' lawyers) tendered to Family Court. T. told her therapist that she had lied about her mother beating her because her mother had removed some of T.'s privileges.
The Family Court ordered the children returned to their parents and dismissed the charges against Mr. Lang. Shortly thereafter, in September 2019, the District Attorney dropped the criminal charges against Ms. Jeter; and in February 2020, Family Court dismissed the case against Ms. Jeter after an adjournment in contemplation of dismissal (ACD). But, as a result of T.'s accusations, her parents' names remained listed as "indicated" for child abuse or neglect on the Register. Under the statutory scheme in place when the Family Court dismissed the charges, the court's determination did not bind OCFS, which often listed names as "Indicated" on the Register even after Family Court had dismissed all proceedings against them. Under the law at the time, persons in that position could request a name-clearing hearing before an administrative law judge within OCFS.
T.'s parents requested name-clearing hearings. Ms. Jeter had been suspended from her job because she was listed on the Register. Her listing on the Register also barred her from finding another job in her field: working with developmentally disabled children and adults. Neither of T.'s parents could afford counsel; they had been represented by court-appointed counsel in Family Court. On August 27, 2020, an ALJ heard Ms. Jeter's request to [*8]clear her name; she had to represent herself because she had no lawyer. ACS was represented by counsel; it presented no witnesses but moved into evidence the entire investigative record.
II.
Under prior and current law, a finding of abuse or neglect by the Family Court creates an irrebuttable presumption that the allegations are supported by a preponderance of the evidence, precluding all challenges to maintaining the related Register record (Social Services Law § 422 [8]).
However, under prior law, even when charges in the Family Court were determined to be unfounded, the finding created no presumption relating to the Register record (8 NYCRR 434.10 [f] ["[D]ismissal or withdrawal of a Family Court petition does not create a presumption that there is a lack of a fair preponderance of the evidence to prove that a child has been abused or maltreated for purposes of this Part"]). OCFS could maintain the "indicated" designation on the Register even if the Family Court determined that the charges were baseless. Persons wishing to have their names removed from the Central Register were required to relitigate allegations they prevailed on in the Family Court; they sometimes obtained inconsistent outcomes in the Family Court and administrative proceedings on identical allegations (see, e.g., Gwen Y. v OCFS, 132 AD3d 1091, 1092 n 1 [3d Dept 2015]; Stephen FF. v Johnson, 23 AD3d 977 [3d Dept 2005]).
In April 2020, the legislature passed and the Governor signed a new law ensuring that Family Court's determinations and dismissal are binding on OCFS. Under current law, if the Family Court dismisses charges of abuse, OCFS must remove the alleged abuser's name from the Register. The legislature altered the law to "reduce the harsh and disproportionate consequences of having an indicated case on the" Register, which "will ultimately relieve individuals from the prospect of being persecuted for the 'crime' of being poor" (Sponsors' Letter to Governor, Veto Jacket, 2019 NY Assembly Bill 8060 at 6). The sponsors noted "widespread agreement that a system meant to help children is actually hurting some families by blocking job opportunities" (id., quoting Yasmeen Khan, Changes Proposed for a System that Stigmatizes Parents Accused of Child Neglect, WNYC, June 12, 2019, available at https: www.wnyc.org/story/state-system-meant-keep-children-safe-actually-hinders-family-stability-advocates-say/). The legislature determined that the best way to do this was by ensuring that the Family Court dismissal of charges required removal of the accused's name from the Register.
OCFS described the purpose of the legislation in the same terms: to "address[ ] the disproportionality and disparity in race and income for families engaged with [Child Protective Services]" (Office of Children and Family Services, Change in Standard of Evidence for Child Protective Services Investigations, 21-OCFS-ADM-26 at 2 [Nov. 4, 2021], https://ocfs.ny.gov/main/policies/external/ocfs_2021/ADM/21-OCFS-ADM-26.pdf; see also Suzanne Miles Gustave, Acting Commissioner of Office of Children and Family Services, Letter in Response to New York State Citizen Review Panels for Child Protective Services 2022 Annual Report [June 23, 2023], https://ocfs.ny.gov/main/reports/cfsp/2024-NYS-APSR-AttB.pdf ["The primary purpose of SCR Reform is to address racial, socioeconomic, and other disparities in the [children's protective services] system while improving outcomes for families and promoting child safety"]).
The 2020 legislation had an effective date of January 1, 2022 (2020 NY Laws Ch. 56 Part R § 11). The effective date was deferred to address the need for the courts and OCFS to put in place the various mechanisms needed to effectuate the automatic removal of names of those vindicated in family court. Then-Governor Andrew Cuomo had vetoed a virtually identical version of the law in 2019, citing the "immediate effective date, which would not allow for adequate time to implement necessary systems changes" (Governor's Veto Mem, Veto Jacket, 2019 NY Assembly Bill 8060 at 5).
The amendment requires that the irrebuttable presumption is reciprocal: acquittal in Family Court creates an irrebuttable presumption that the parent did not commit abuse and therefore cannot be listed on the Register. The irrebuttable presumption favoring the parent exists "where [the] child protective service withdraws such petition with prejudice, where the family court dismisses such petition, or where the family court finds on the merits in favor of the respondent" (Social Services Law § 422 [8] [b] [ii]; Social Services Law § 424-a [1] [e] [vi]). A parent who obtains any of those outcomes is entitled to an "Unfounded" designation in the Register (id.).
The legislature changed whether an irrebuttable presumption applies to Family Court determinations in name-clearing hearings to eliminate a variety enumerated injuries resulting from persons who prevailed in Family Court—including people like Ms. Jeter who had counsel in Family Court but not in administrative proceedings. Now, Sections 422 (8) and 424-a (1) (e) provide that the state's interest in the public identification of child abusers is determined solely by Family Court, where—unlike the administrative proceedings before OCFS—the parties have the right to counsel, the rules of evidence apply, and a Family Court Judge decides the case instead of an employee of OCFS. Family Court's decision automatically determines placement on the Register.
After Family Court dismissed the charges against Ms. Jeter, she challenged her "Indicated" report before an ALJ for OCFS. Her hearing took place in August 2020, four months after the new law was enacted but almost sixteen months before it was scheduled to take effect. The next month, the ALJ denied her request. Ms. Jeter challenged that determination in an article 78 proceeding timely filed in January 2021 in Supreme Court. Supreme Court transferred the case to the Appellate Division, which decided Ms. Jeter's case on June 28, 2022—over five months after the new legislation took effect.
III.
A.
Among the several arguments Ms. Jeter advances, one is patently correct: because her case was pending when the new legislation took effect, it applies to her case and she is therefore entitled to have her designation on the Register changed to "Unfounded." Chief Justice John Marshall stated the general rule: "if subsequent to the judgment and before the decision of the appellate court, a law intervenes and positively changes the rule which governs, the law must be obeyed, or its obligation denied" (United States v Schooner Peggy, 5 US 103, 110 [1801]). The Supreme Court has continued to follow that rule. In Thorpe v Housing Auth. of Durham, the Supreme Court reaffirmed that "[t]he general rule . . . is that an appellate court must apply the law in effect at the time it renders its decision" (393 US 268, 281 [1969]).
We have unfailingly followed that same rule: "a court applies the law as it exists at the time of appeal, not as it existed at the time of original determination" (Matter of Asman v Ambach, 64 NY2d 989, 990 [1985], citing Matter of Alscot Investing Corp. v Board of Trustees, 64 NY2d 921 [1985], Post v 120 E. End Ave. Corp., 62 NY2d 19, 28—29 [1984], Mayer v City Rent Agency, 46 NY2d 139, 149 [1978], Matter of Tartaglia v McLaughlin, 297 NY 419 [1948], and Quaker Oats Co. v City of New York, 295 NY 527, 536 [1946]; see also Arthur Karger, Powers of the New York Court of Appeals, § 17:7 2023 ed [Westlaw], citing In re Kahn's Application, 284 NY 515, 523 [1940], Demisay, Inc. v Petito, 31 NY2d 896, 897 [1972], Asman, 62 NY2d at 990, and Alscot Investing Corp., 64 NY2d at 922]).
The case before us is an article 78 proceeding challenging an administrative decision made under preexisting law. The ALJ did not err in applying old law, because that was the law in force at the time. The new law took effect only later, when the article 78 action challenging the ALJ's determination was pending. In those exact circumstances, we and the Appellate Division have consistently applied the new law on appeal, not the old law that was in effect when the administrative decision was made (see, e.g., Alscot Investing Corp., 64 NY2d; Matter of Scism v Fiala, 122 AD3d 1197 [3d Dept 2014]; Matter of Jamaica Recycling Corp v City of NY, 38 AD3d 398 [1st Dept 2007]; Matter of Trifaro v Town of Colonie, 31 AD3d 821 [3d Dept 2006]; D'Agostino Bros Enters v Vecchio, 13 AD3d 369 [2d Dept 2004]; Linder v Schneider, 176 AD2d 319 [2d Dept 1991]).
Courts around the country, from the Founding until now, have held that when the law changes in this way the change in law can be raised for the first time on appeal, even before a court of last resort. (See, e.g., United States v Chambers, 291 US 217, 226 [1934]; Hamling v United States, 418 US 87, 101—102 [1974]; Henderson v United States, 568 US 266, 271—277 [2013]; Demars v First Service Bank for Savings, 907 F2d 1237 [1st Cir 1990]; EEOC v Westinghouse Elec Corp, 765 F2d 389 [3rd Cir 1985]; Alexander S. v Boyd, 113 F3d 1373, 1388 [4th Cir 1997]; Deck v Peter Romein's Sons, Inc., 109 F3d 383, 386 [7th Cir 1997]; Ex parte L.J., 176 So 3d 186, 194 [Ala 2014]; Fresneda v State, 458 P2d 134, 143 [Alaska 1969]; People v Bank of San Luis Obispo, 159 Cal 65, 68—69 [1910]; Nevada D.H.H.S. Div. of Welfare v Lizama, 2016-SCC-0031-FAM, 2017 WL 6547070, at *4 [N Mariana Is., Dec. 21, 2017].) Several of our cases speak to that very point. (See, e.g., Post v 120 E. End Ave. Corp., 62 NY2d at 28—29 ["new questions of law may be raised for the first time on appeal if they could not have been presented to the trial [*9]court"], citing Cohen & Karger, Powers of the New York Court of Appeals, §§ 161, 162, now Karger, Powers of the New York Court of Appeals, § 17:7; Regina Metropolitan Co, LLC v NYS Division of Housing and Community Renewal, 35 NY3d 332, 362—363 [2020], quoting In re Gleason, 96 NY2d 117, 121 n [2001].) Although the State argues that we cannot reach Ms. Jeter's argument because her failure to alert the ALJ to the not-yet-effective amendment renders the issue unpreserved, the majority correctly rejects that argument by reaching the merits of Ms. Jeter's claim.[FN10]
When addressing the merits, however, the majority abandons the settled law in Ms. Jeter's favor by mischaracterizing the legal issue at stake. The question is not whether the law applies "retroactively to OCFS determinations rendered before the effective date" (majority op at 8); the question is whether once the changed statute became the law, its new "rule of decision" applies to Ms. Jeter's appeal (Schooner Peggy, 5 US at 110). This case is not about the retroactive impact of a law: the majority's analysis is addressed to someone whose appeals were exhausted before January 1, 2022. That is not Ms. Jeter.
A law has "genuinely retroactive effect" where "it would impair rights a party possessed when he acted, increase his liability for past conduct, or impose new duties with respect to transactions already completed" (Landgraf v USI Film Products, 511 U.S. 244, 277, 280 [1994]). But the new Social Services Law § 422 (8) does none of those things. The majority's argument to the contrary is based not on law or fact, but on conjecture. "A statute does not operate 'retrospectively' merely because it applied in a case arising from conduct antedating the statute's enactment" (Gottwald v Sebert, 40 NY3d 240, 258 [2023]). When a law impugns no previous rights, imposes no new liability, or unsettles final matters (such as lawsuits that have exhausted their appeals) "the law as it exists at the time a decision is rendered on appeal is controlling" (Alscot Invest. Corp., 64 NY2d at 922). The majority can point to no circumstance here that defeats the U.S. Supreme Court's recitation of settled law: "a court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary" (Bradley v School Bd. of City of Richmond, 416 US 696, 711 [1974)]). The majority ignores those cases—instead it manufactures statutory guidance where there is none and fabricates an interest for OCFS to create the appearance of retroactivity.

 
 B.
 The majority claims "it is clear that the legislature intended that the statutory amendments would not apply until January 1, 2022." The first problem is that there is a difference between the law changing on a date and the law applying before that date. The law that courts apply to a pending case when a statute or decisional law changes is the law as it is on that day. Had Ms. Jeter's name clearing hearing happened on January 2, 2022 instead of before the effective date of the new Social Services Law § 422 (8) (b) (ii), no one could dispute that the ALJ would have had to apply the irrebuttable presumption. The ALJ would have applied the law as it was that day. The same is true for the Appellate Division—and should be for this Court. That does nothing to undercut the law's effective date.
The second problem with the majority's rationale is that we assume the legislature understands the law—including this Court's decisions. "The Legislature is . . . presumed to be aware of the decisional and statute law in existence at the time of an enactment" (Arbegast v Board of Educ. of S. New Berlin Cent. Sch., 65 NY2d 161, 169 [1985])]; "Ascertainment of the legislative intent behind [an] enactment . . . requires consideration of the decisional law background . . . of which it may be presumed the Legislature was aware and, to the extent it left it unchanged, that it accepted" (Hammelburger v. Foursome Inn Corp., 54 N.Y.2d 580, 588 [1981]).
When the law became effective on January 1, 2022, Ms. Jeter's appeal was pending. Courts, including ours and the U.S. Supreme Court, uniformly hold that a law that becomes effective while an appeal is pending applies to [*10]that case. If the legislature had any doubt about whether Schooner Peggy, Thorpe, Bradley, Landgraf, Asman, Alscot Invest. Corp., Post, Mayer, Matter of Tartaglia, Quaker Oats Co., In re Kahn's Application, Demisay, Inc. or Regina would apply, it could have said so. It would have been very easy to include in the amended Social Services Law Sec. 422 that the irrebuttable presumption would not apply to cases on appeal on the effective date. The legislature said nothing of the kind here.
The 2020 amendments themselves show that the legislature chose to make that distinction when it wanted to.. The statutory text distinguishes between investigations commenced prior to the January 1, 2022 effective date that determine whether evidence was "credible," and investigations begun after the effective date backed by a "fair preponderance" (Social Services Law § 412 [6]-[7] and Social Services Law § 422 [5] [a]). Those date-specific amendments also change rules of decision. But when it came to the irrebuttable presumption, the legislature did not put in parallel text circumscribing its impact on name clearing hearings after January 1, 2022: neither sections 422 (8) and 424-a (1) (e) have any language circumscribing their application once codified.
The third problem is where the majority's logic then takes it: to a faulty interpretation of the delayed effective date. " '[T]he date that legislation is to take effect is a separate question from whether the statute should apply to claims and rights then in existence' " (People v Pastrana, 41 NY3d 23, 30 [2023], quoting Majewski v Broadalbin-Perth Cent. School Dist., 91 NY2d 577, 583 [1998]). Although a delayed effective date may be relevant to a retroactivity analysis, it is not so in a change in law analysis. The majority cites People v Galindo to try to demonstrate that a delayed effective date should be dispositive here (38 NY3d 199, 202 [2022]; majority op at 10). There, we considered whether the new speedy trial obligations in CPL 30.30 (1) could apply to a case that was on appeal after the change in law took effect; we found it could not because to apply it would require the appellate court to "reach back" and entirely redo the entire pre-judgment period (id. at 207). Doing so would have imposed new duties on the prosecution—duties that the prosecution argued did not even apply to the kind of traffic case at bar in Galindo. The additional speedy trial duties of CPL 30.30 (1) in Mr. Galindo's case gave that law a genuine retroactive effect. The dispositive issue in Galindo was not whether the law took effect while the case was on appeal—it was whether the law took effect before the duties it imposed on the prosecution and rights it granted defendants was before or after the criminal action began.
Fourth, the majority disregards the legislature's intent. With no basis, it claims that this Court only just recently began to consider the legislature's intent in change of law cases. And then carrying the mantle of legislative intent, it cites Majewski's maxim that "It is fundamental that a court, in interpreting a statute, should attempt to effectuate the intent of the Legislature" (91 NY2d at 583), only to disregard the intent of the legislature here: to render Family Court's decisions determinative of whether a person would be listed on the Register and remove that function from OCFS ALJs. The legislature reworked the 2020 amendments with a delayed effective date in apparent response to Governor Cuomo's objection that OCFS needed time to implement the changes. After giving the agency 18 months, the irrebuttable presumption had to be in place for all dismissals. The majority creates an exception for pending cases that the legislature did not write.

 
 C.
 To transform the new Social Services Law Sec. 422 (8) (b) (ii) into one with retroactive effect, the majority dreams up a new duty for OCFS. Perhaps, the majority supposes, ACS "might not have offered, and Family Court might not have granted" an ACD "if the impact of that ACD would be that [Ms. Jeter's] report would not appear on the SCR"—because then the law would "impos[e] new duties" on ACS (majority op at 12, emphasis added). The majority wonders how a law that took effect in 2022 after being passed in 2020 might have shaped ACS's ACD negotiating strategy in 2019—but a hypothetical impact on negotiating strategy is not a new duty. Unsupported conjecture is not supposed to be the basis for appellate decisionmaking.
Its hypothesis about how ACS's approach to the ACD would have differed—even were it supported by the record—is immaterial. To start, we do not know here whether ACS consented to or even opposed Ms. Jeter's ACD and dismissal—we only know that Family Court granted it. The amendment did not alter ACS's rights to oppose or support an ACD, nor did it alter ACS's duties to protect children. Those remain unchanged regardless of whether the result in Family Court would have led to the irrebuttable presumption for the SCR entry. Most importantly, the [*11]legislature did not write the law with any consideration of ACS's position on a dismissal or ACD. The law requires the irrebuttable presumption whenever "the family court dismisses such petition" with no distinction for whether it was dismissed after an ACD, on the initiative of ACS or sua sponte by Family Court (Social Services Law § 422 [8] [b] [ii]). Nor would the new law have imposed new liability on ACS if the irrebuttable presumption had applied to ACDs. It certainly did not create a new duty for ACS.
The majority elevates OCFS over the actual legislators in New York State. Because ACS and OCFS "were entitled to rely on the law as it existed at the time" of Ms. Jeter's Family Court proceeding (majority op at 12), the legislature's decision to remove OCFS from the picture in favor of automatic results based solely on Family Court proceedings does not matter: under the majority's view, those governmental agencies had a legally protectible interest in the law and policy of the State not changing. But a public agency cannot claim to have an interest in not abiding by the public policy or law made by the legislature. No one, and surely not an arm of the executive branch, is "entitled" to any reliance on the law remaining the same (see J. B. Preston Co v Funkhouser, 261 NY 140, 144 [1933] affd, 290 US 163 [1933] ["Nor has a person a vested interest in any rule of law entitling him to have the rule remain unaltered"]). Moreover, even if ACS could be said to have had relied on Ms. Jeter's remaining on the SCR, the legislature extinguished any public interest in a SCR independent of Family Court determinations.
The majority cannot create retroactive impact in a law that merely changes how an administrative record works. Its mistakes illustrate a prudential reason why courts apply new rules of decision on appeal where they do not have genuine retroactive effect—we cannot know whether ACS or Family Court would have thought about Ms. Jeter's ACD differently if her case had been before them three years in the future. When a change in law would materially affect the rights, liabilities or duties of the parties, we might conclude that applying a law before its effective date imposes a retroactive effect. But because the new law does none of those, and instead provides a different "rule of decision," we should follow Chief Justice Marshall and over two centuries of jurisprudence to apply the law as it is today.
Ms. Jeter's position is both legally correct and practically sensible. Until the statute took effect, there was no legal basis for the ALJ or a court to apply it. Ms. Jeter raised the application of the new legislation to her case before the Appellate Division, which was her first opportunity to do so. Because the law simply changes the rule of decision without creating new duties or liabilities, it has no retroactive effect; the change in law that took effect while her legal claim was pending must apply to Ms. Jeter's case.

 
 IV.
 Because I would reverse on the above grounds, I would not reach any of Ms. Jeter's other claims. I note, however, that although the majority does not acknowledge it, the strength of her facial due process claim as to the denial of counsel is difficult to assess because the application of the new legislation should radically decrease and alter the nature of name-clearing hearings going forward. The majority does, however, silently and correctly concede that Ms. Jeter did not need to preserve her right to counsel claim.
There is a sharp irony in Ms. Jeter's case. Her chosen career is aiding developmentally disabled persons. She first fostered and then adopted her grand-nieces. She later lost her job and profession because of a recanted accusation. When represented by a lawyer, all charges against her were dismissed by a Family Court Judge, but when she was subsequently unrepresented, an ALJ concluded Ms. Jeter did not meet her burden to prove what Family Court already determined.
Perhaps even more ironic is the majority's decision to mischaracterize a change in law as a retroactive law. In seeking to find a "manifest injustice" that would justify its determination that the law has retroactive effect, the majority would continue to lock Ms. Jeter out of her chosen career of serving others. The legislature has displaced the agency's determination with Family Court's, but the majority ignores the language and entire purpose of that amendment. Our job is to follow settled law and the legislature's command. Here, that requires us to reverse and remit to ensure Ms. Jeter has the benefit of the legislature's judgment that Family Court's processes and orders are superior to those of an administrative law judge.
Order affirmed, without costs. Opinion by Judge Troutman. Judges Garcia, Singas and Cannataro concur. Chief Judge Wilson dissents in an opinion, in which Judges Rivera and Halligan concur.
Decided November 25, 2024

Footnotes

Footnote 1: Petitioner is T.'s biological great aunt and adoptive mother.

Footnote 2: Family Court Act § 1012 (f) (i) (B) defines a "[n]eglected child" to include a child who is subject to "excessive corporal punishment." T. told the ACS caseworker that petitioner beat her with an extension cord as punishment for perceived misbehavior.

Footnote 3: Pursuant to the statutory definitions applicable to the SCR, a "maltreated child" is a child who is "defined as a neglected child by the family court act" or a child "who has had serious physical injury inflicted upon him or her by other than accidental means" (Social Services Law § 412 [2]).

Footnote 4: As a result of OCFS's determination, an employer "must inquire of the [SCR] whether there is an indicated report" on petitioner if she sought "employment in a job that would involve 'regular and substantial contact with children' " (Lee TT., 87 NY2d at 705, citing Social Services Law § 424-a [1] [b] [i]). Petitioner would be prohibited from employment in such a position unless the employer maintained a written record regarding the reasons for approval (see Social Services Law § 424-a [2] [a]). With the exception of permitted disclosures to certain child care agencies and law enforcement, SCR reports are confidential and unlawful disclosure constitutes a misdemeanor (see generally Lee TT., 87 NY2d at 705; Social Services Law §§ 422 [4]; 424-a). 

Footnote 5: Petitioner also relies on the fact that her husband, who was represented by counsel during his SCR proceeding, was successful, attributing his success to the representation. OCFS explains, however, that the allegations against petitioner's husband were based upon his alleged beating of T. with an extension cord in May of 2019, after which she told no one and had no marks that were still visible when ACS's investigation commenced in June of 2019. ACS chose not to present evidence at the SCR hearing for petitioner's husband, requiring dismissal regardless of whether he was represented by counsel.

Footnote 6: The dissent relies heavily on United States Supreme Court and federal case law, but "[i]f no Federal constitutional principles are involved, the question of retroactivity is one of State law" (People v Martello, 93 NY2d 645, 650 [1999]). Asman is also distinguishable. There, the legislature specifically provided that the statutory amendments at issue there would apply to proceedings in which a notice of hearing had been served prior to the effective date of the statutory amendments (see 64 NY2d at 990).
Footnote 7: Counsel for OCFS has also asserted that the new irrebuttable presumption is not automatically applied to Family Court article 10 dismissals, but rather, in order to determine whether the presumption applies, the relevant local child protective agency must review all the relevant Family Court records and any findings made by Family Court in order to confirm that the Family Court disposition qualifies for the irrebuttable presumption (see Office of Children and Family Services, Administrative Directive 33, 21-OCFS-ADM-33, at 9 [Dec. 23, 2021], available at https://ocfs.ny.gov/main/policies/external/ocfs_2021/ADM/21-OCFS-ADM-33.pdf [last accessed 11/18/2024] [stating that an ACD in Family Court "may or may not" result in an irrebuttable presumption in the SCR proceeding, depending in part upon whether a "finding of abuse or neglect was made" during the Family Court proceeding]). Although the dissent concludes that the ACD petitioner received in Family Court would qualify for the statutory presumption (see dissenting op at 16), in light of our holding that the statutory amendments do not apply to OCFS's fair hearing determinations rendered before the January 1, 2022 effective date, we express no opinion on that issue.

Footnote 8: For example, the dissent asserts that T.'s teachers "confirmed that she had no marks on her arms when she was at school that day" (dissenting op at 3). This appears to be based upon petitioner's assertion that petitioner did not see any bruising before T. left for school, and that none of T.'s teachers called ACS to report bruising. Of course, the fact that T.'s teachers did not call ACS to report any injuries before a different teacher called the police does not mean that T.'s injuries did not exist, particularly where T.'s injuries were observed and photographed. The record does not state that T. told her therapist that she had lied "about her mother beating her" (dissenting op at 4). Rather, T.'s therapist stated in a letter that T. had admitted that she "lied on her aunt about various things because her aunt took away some of her privileges," something OCFS determined that T. also told ACS as an explanation for why petitioner had beaten her in the first place. Petitioner further asserted that T.'s purported recantation should be considered credible because, according to petitioner, it was offered to Family Court by the attorney for the child (see dissenting op at 3-4). The full record of the Family Court proceedings is not before us, and the record does not demonstrate whether Family Court found this letter credible, found that it had any bearing on whether the incident actually occurred, or considered it relevant to whether T.'s best interests would be served by returning to her home provided that petitioner received adequate parenting supports. Ultimately, where, as here, there are facts in the record supporting OCFS's determination, we are bound to apply the substantial evidence standard and uphold the administrative determination, even if there is evidence in the record supporting a contrary conclusion (see Haug, 32 NY3d at 1046).

Footnote 9: Jeter and Lang are T.'s great aunt and great uncle; they first fostered T. and her two younger sisters and later adopted them.

Footnote 10: Lack of preservation is a threshold issue that prevents us from addressing a question on the merits (see Bingham v New York City Tr. Auth., 99 NY2d 355, 359 [2003], citing Telaro v Telaro, 25 NY2d 433, 439 [1969]). The majority's merits resolution of Ms. Jeter's argument about right to counsel, like its merits resolution of Ms. Jeter's claim as to the amendment's applicability, necessarily rejects the State's argument that a claim to the constitutional right to counsel must be preserved.